IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JULIO DE LIMA SILVA,

                Plaintiff,

v.

STATE OF WISCONSIN,
DEPARTMENT OF CORRECTIONS, et al.,

                Defendant.

OPINION AND ORDER

17-cv-128-wmc

Plaintiff Julio de Lima Silva, a sergeant with the Wisconsin Department of Corrections ("DOC"), alleges that he was subjected to discipline after a use-of-force incident because of his race and national origin in violation of both Title VII of the Civil Rights Act and the Equal Protection Clause of the United States Constitution. Before the court is defendants' motion for summary judgment (dkt. #35), which will be granted due to insufficient evidence of discrimination.

## BACKGROUND[1]

Plaintiff Julio de Lima Silva was born in and remains a citizen of Brazil.[2] After moving to the United States, he became a correctional officer with the DOC and eventually was promoted to the rank of sergeant. At his request, de Lima Silva was transferred to the St. Croix Correctional Center ("SCCC"), where all of the events at issue occurred.

---

[1] Viewing the evidence of record in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted.

[2] While there is some ambiguity in the pleadings, it will be assumed for purposes of this motion that each defendant was aware of plaintiff's race and national origin.

Defendants were also employees of the DOC at all relevant times -- Quala Champagne was the warden at SCCC; Andrea Bambrough was an institution human resources director with DOC; David Hicks was an employee relations specialist with DOC; and JoAnn Skalski was a superintendent at SCCC.[3]

At the heart of this case is a use-of-force incident at SCCC, which took place in the early morning of June 23, 2014. Apparently confronted with an inmate, Fernando Haro, who refused verbal orders to return to his bed as he waited to use the bathroom, de Lima Silva used a technique known as "decentralization," which involves forcing an inmate off balance and to the floor. After bringing Haro to the floor, de Lima Silva then held him in place for two minutes and 17 seconds before escorting him to another room without the use of handcuffs. Video footage of the incident was captured by a surveillance camera and submitted to the court for review. Before this incident, de Lima Silva had received positive performance reviews, indicating that he was meeting or exceeding expectations. On July 25, 2014, roughly a month after the use-of-force incident, de Lima Silva was placed on administrative suspension.

When interviewed, de Lima Silva claimed the inmate had made a target glance, tensed his muscles, and made fists in a fighting stance. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶¶ 22, 44.) De Lima Silva maintains that the inmate "abruptly" raised his arms at 00.28 of the video, but the reaction of at least ten DOC employees who reviewed the video was to doubt de Lima Silva's account of the incident and to question whether his use

---

[3] Because defendant Skalski appears to lack sufficient personal involvement in the matter charged, the parties do not dispute that she should be dismissed from the case.

2

of force was justified. (*Id*. at ¶¶ 56, 60, 75, 81, 111, 118.) After reviewing the video, Warden Champagne asked herself, "What is he doing swinging the inmate to the ground and having him on the ground like that?" (*Id.* at ¶ 43.) As a result, the Warden found that de Lima Silva's use of force "did not seem appropriate" to her. (*Id*.)

Nevertheless, to preserve objectivity, a use of force review was conducted by outside personnel. Jason Achterberg, the security director at the Stanley Correctional Institution, and Hans Kuster, a captain at the Oshkosh Correctional Institution, were enlisted to conduct the review. They concluded that:

> During this review, it was apparent Sgt. Silva's perception differed greatly from what was observed on the video. Sgt. Silva's perception of threat he explained is not consistent with the actions of Inmate Haro seen on the video. Sgt. Silva claims Haro moved into a boxer's stance. The video does not show Haro move other than a slight head turn and moving his hands forward, not in the direction of Sgt. Silva. Sgt. Silva stated he felt threatened and could not disengage. The video does not show Haro actively resisting or moving in an overt fashion that would preclude someone from disengaging.
> For these reasons, it is determined that this use of force was unreasonable under the circumstances. It appears this use of force was to compel the inmate to comply with the rules of the Program and not to prevent an assault of staff or other inmates.

(Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶ 111.)

Maria Silao-Johnson, the superintendent at the Gordon Correctional Center in Douglas County, and Jeffrey Jaeger, the superintendent of the Drug Abuse Correctional Center in Winnebago, conducted a separate WCCS personnel investigation and interviewed de Lima Silva on August 20, 2014. De Lima Silva avers that Jaeger laughed at

his accent and accused him of being a liar during this interview.[4] After further investigation, Silao-Johnson and Jaeger concluded that de Lima Silva had violated three DOC work rules: Rule # 2 for using excessive force; Rule # 6 for providing false information in his incident report and for telling investigators that the inmate assumed a fighting stance; and Rule # 11 for threatening or attempting to inflict bodily harm on an inmate without provocation or reasonable justification. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶ 60.)

These personnel investigation findings were then turned over to an Infraction Review Team ("IRT") for review. The IRT consisted of SCCC Warden Champagne, HR Director Bambrough, Employment Relations Specialist David Hicks and a security director. As a whole, the IRT also agreed that de Lima Silva's use of force was not justified. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶ 81.) Based on their review of the personnel investigation, the IRT further determined that de Lima Silva may have violated work rules and proceeded to a pre-disciplinary hearing.

After de Lima Silva was notified and given the opportunity to respond to the IRT's findings, Champagne, Bambrough, Hicks and the security director were required to reconvene as the Disciplinary Action Review Team ("DART") to determine whether and what discipline should be imposed. With the agreement of the other members of DART, Warden Champagne chose to terminate de Lima Silva. She followed up with a formal letter to de Lima Silva that explained he had been terminated for (1) violating use of force

---

[4] Although this is disputed by defendants, the court must accept de Lima Silva's version of the interaction for purposes of summary judgment.

policies, (2) intending to harm an inmate, and (3) providing false information. (Second Am. Compl. (dkt. #14) ¶ 14.)

The matter did not end there, however, because de Lima Silva was subsequently provided a review hearing and reinstated to his position by the Wisconsin Employment Relations Commission, which found that de Lima Silva had not been terminated for "just cause" under state civil service laws. (Second Am. Compl. (dkt. #14) ¶ 26.)[5]

OPINION

Defendants now move for summary judgment on the basis that plaintiff lacks sufficient evidence for a reasonable trier of fact to find that he received discipline because of his race and national origin. Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, where the non-moving party has the burden of proof, as de Lima Silva does here, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quotation marks omitted) (citing *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). For the reasons explained below, plaintiff has failed to produce sufficient evidence to support his claims against the named defendants.

---

[5] The Commission did not address whether de Lima Silva had been terminated for a discriminatory reason.

## I. Race and National Origin Discrimination Claims

The Seventh Circuit has held that "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). Typically, proof of intentional discrimination has been accomplished by either the direct or indirect methods. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (articulating burden-shifting framework sometimes referred to as the "indirect" method of proving employment discrimination). Recognizing that the evidentiary distinctions in these methods have proven stilted and difficult to discern, the Seventh Circuit recently endorsed considering the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of the Chief Judge of Cook Cty.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (affirming summary judgment on a reverse race discrimination claim where plaintiff only put forward evidence that he was white and his better-paid colleague was African American). However, the Seventh Circuit has not found the old methods are inappropriate, *Ortiz*, 834 F.3d at 766, and because the parties have organized their arguments consistent with the two methods, the court will as well, while mindful that the ultimate question is simply whether plaintiff has presented sufficient evidence from which a reasonable finder of fact could conclude that defendants discriminated against him because of his race and national origin.

### A. Direct Method of Proof

Under the direct method of proof, evidence must "point directly to a discriminatory

reason for the employer's action." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 501 (7th Cir. 2010) (quotation marks omitted) (citing *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008)). This "requires the plaintiff to put forth evidence [demonstrating his membership in] a protected class [resulted in] the adverse employment action." *Atanus*, 520 F.3d at 672 (internal citations and quotation marks omitted).

Contrary to its name, the direct method allows for proof to be circumstantial in character and includes "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 711 (7th Cir. 2013). Indeed, this is the most typical form of evidence considered under the direct method, because parties do not usually admit their bias or discriminatory motivations. *Id*. at 10 (stating that non-circumstantial direct evidence of discrimination "would require something akin to an admission.") (citing *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006)). Employees are similarly situated if they "engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002)). This determination requires examination of "all relevant factors, the number of which depends on the context of the case." *Id*. at 1049.

Here, plaintiff alleges that he received greater discipline than Terry Korte, a white colleague and United States citizen, who was involved in his own use-of-force incident. (Second Am. Compl. (dkt. #14) ¶¶ 19, 23.) When otherwise similarly situated employees are punished differently for workplace offenses, the "crux of the issue is whether [the

7

employees'] misdeeds were 'sufficiently distinct' to distinguish meaningfully between them at summary judgment, or whether a jury could reasonably find they were comparable." *Perez*, 731 F.3d at 705. Under this standard, however, the record does not create an inference that Korte's conduct was comparable to that of plaintiff. Most fundamentally, both the use of force review and the personnel investigation found that plaintiff's use of force was unreasonable and that he was not truthful when interviewed. In contrast, there was no allegation of comparable dishonesty about the most significant details of the Korte incident.[6] Unlike plaintiff, Korte also admitted to his superiors that he had made a mistake. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶ 137.)[7] Here, plaintiff still maintained his version of events even in the face of contrary video evidence.

Nor does the amount of force applied by Korte appear to be comparable. Without choosing between the parties' somewhat different accounts of that incident, it appears that Korte physically pushed an inmate toward a wall, put his hands on his head, and then

---

[6] At most, there was some dispute over whether Korte *immediately* reported his use-of-force incident. Even if a reasonable jury could conclude that plaintiff and Korte engaged in similar conduct, it would not necessitate the conclusion that defendants employed impermissible, pretextual reasons in their decision to terminate plaintiff as discussed later in this opinion. Nor would the fact that Warden Champagne had an incomplete, if not inconsistent, recollection of the Korte incident when questioned about it years after it occurred.

[7] Defendants also argue that Warden Champagne has terminated individuals of multiple races: five Caucasians, two African Americans, and plaintiff, who is Brazilian. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶ 133.) However, this small sample size does not reveal whether plaintiff was subject to different standards due to his race or national origin. Nor is it persuasive that *plaintiff* himself previously used the decentralization technique under different circumstances with no adverse consequences, as that does not reveal if inconsistent standards have been applied to similar uses of force. (*Id*. at ¶ 85.) If anything, it is an additional reason for concern by the IRT, DART, and SCCC's Warden over the prospect of keeping de Lima Silva on as a guard, as well as a further reason to question plaintiff's claim that his race or national origin was a factor in his discipline stemming from the later use of force.

8

pushed him into the wall without force comparable to that of a decentralization. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶¶ 136-39.) Finally, while it was found that Korte had violated DOC policy, there was no comparable allegation that Korte's actions constituted excessive force. (*Id*. at ¶ 139.)

As separate proof under the direct method, plaintiff also points to his claim that Jaeger laughed at his accent during their investigatory interview (a charge that defendants dispute). (Pl.'s PFOF (dkt. #61) ¶ 125.) Plaintiff further claims that Jaeger called him a liar during the same interview and that inaccurate statements were attributed to him. (*Id.* at ¶¶ 123-30.) These allegations, too, are insufficient in light of the entire record, as there is no evidence that Jaeger's claimed conduct made a material difference to the eventual decision to terminate plaintiff when each individual involved with the use of force review, the personnel investigation, the IRT, DART and Warden Champagne, who made the final decision to terminate, reached the same conclusions as to the use of force being excessive and plaintiff not being truthful. Given these widely-shared conclusions, there is no evidence that Jaeger's disrespectful and accusatory tone meant that any of the named defendants were motivated by de Lima Silva's race or national origin. To the contrary, it is undisputed that Jaeger had reviewed the video multiple times and believed that plaintiff's actions may have constituted cruel and unusual punishment. (Defs.' Reply to Pl.'s Resp. DFOF (dkt. #87) ¶¶ 53, 54.) Regardless, Jaeger is not even a named defendant, nor has plaintiff pursued a cat's paw theory that might permit imputing his claimed discriminatory motives to superiors who actually made the decision, much less offer evidence supporting such a claim.

## B. Indirect Method of Proof

Under the indirect method of proof, the *McDonnell Douglas* framework remains useful. *Ortiz*, 834 F.3d at 766. To establish a prima facie case of racial discrimination under the *McDonnell Douglas* framework, plaintiff must show that: "(1) he is a member of a protected class, (2) he is similarly situated to members of the unprotected class, (3) he suffered an adverse employment action, and (4) he was treated differently from members of the protected class." *Williams*, 342 F.3d at 788. Proof of these factors is ordinarily sufficient for plaintiff to make a prima facie showing that "defendants treated [him] differently from others who were similarly situated," and that this differential treatment was "because of [his] membership in the class to which [he] belonged." *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001) (citing *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). The burden then shifts to the defendants to put forward a nondiscriminatory, legitimate reason for their actions. *Williams*, 342 F.3d at 788. If the defendants are able to do so, the plaintiff must then demonstrate that the reasons offered were pretextual. *Id*. Here, plaintiff's race and national origin are both protected classes and his termination was an adverse employment action. However, the evidence does not support an inference that similarly situated members of an unprotected class received more lenient treatment for the reasons just discussed.

Even if the *McDonnell Douglas* factors were construed in plaintiff's favor, plaintiff offers no evidence for a reasonable trier of fact to infer that de Lima Silva's excessive use of force or dishonesty were mere pretext for defendant's actions. When "an employer has cited performance issues as the justification for the adverse action, the performance

element of the prima facie case cannot be separated from the pretext inquiry." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (quotation marks omitted). The pretext inquiry asks "not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Id*. (citing *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012)). "As a result, arguing about the accuracy of the employer's assessment is a distraction in the pretext context; the fact that a statement is inaccurate does not mean that it is a deliberate lie." *Id*. (quotation marks omitted) (citing *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 744 (7th Cir. 2002)).

The undisputed facts establish that *every* DOC employee who viewed the video footage of the incident other than de Lima Silva himself believed he had used excessive force, and separate investigatory and review bodies all concluded that he had not been truthful about what occurred. On this record, a reasonable trier of fact would have no basis to doubt that plaintiff was terminated because of a widespread and sincere belief among those who evaluated his conduct that he had used excessive force and that he was not truthful about his actions. Regardless, plaintiff has wholly failed to prove that this collective view was tainted by any race or national origin discrimination, making irrelevant questions of whether DOC guidelines were in fact violated or whether plaintiff's perception of events is sincere or accurate.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #35) is GRANTED.

2) The clerk of the court shall enter judgment for defendants and close the case.

Entered this 19th day of June, 2018.

                        BY THE COURT:

                        /s/
                        _____
                        WILLIAM M. CONLEY
                        District Judge